# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: October 15, 2019

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| IOLA SYKES, | * | No. 17-716V |
| | * | |
| Petitioner, | * | Special Master Sanders |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' Fees and Costs; Reasonable |
| AND HUMAN SERVICES, | * | Basis; Reduction for Unnecessary Billing |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | | |

## DECISION[1]

On May 31, 2017, Iola Sykes ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Program" or "Act"). 42 U.S.C. § 300aa-10 to -34 (2012).[2] Petitioner alleged that she suffered from optic neuritis as a result of the Tetanus-Diphtheria-acellular-Pertussis ("Tdap") vaccination she received on September 6, 2016. Pet. at 1, ECF No. 1. On December 17, 2018, Petitioner filed an unopposed motion for a decision dismissing her petition, *see* ECF No. 46, and I dismissed her petition on December 21, 2018, ECF No. 47.

On March 26, 2019, Petitioner filed a motion for attorneys' fees and costs, seeking $19,973.00 in attorneys' fees and $2,596.86 in costs for a total of $22,569.86. Pet'r's Mot. for Attys' Fees and Costs, ECF No. 51 [hereinafter Pet'r's Mot. for AFC]. On April 8, 2019, Respondent filed his response to Petitioner's motion, objecting on the basis that Petitioner failed to establish a reasonable basis for her claim. Resp't's Resp. at 2, ECF No. 52. Petitioner filed her reply brief on April 15, 2019. Pet'r's Reply, ECF No. 53. For the reasons stated below, I find that Petitioner satisfied the statutory requirements for an award of attorneys' fees and costs, and therefore **GRANT** Petitioner's motion.

### I.  Procedural History

---

[1] This decision shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision. If, upon review, the undersigned agrees that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99–660, 100 Stat. 3755.

1

Petitioner filed her petition on May 31, 2017. Pet. at 1. Over the next four months, Petitioner filed fourteen exhibits in support of her petition. *See* Pet'r's Exs. 1–14, ECF Nos. 5-2–5-9, 13-2, 17-2, 18-2, 21-2, 22-2. On December 15, 2017, Respondent filed a status report indicating that he wished to contest entitlement in this case, ECF No. 25.

Respondent filed his Rule 4(c) report on February 14, 2018, in which he argued that compensation should be denied because Petitioner "ha[d] not established that she suffered the residual effects or complications of optic neuritis for the requisite six months[]" as required under the Act. Respt's' Report at 5, ECF No. 32. I held a Rule 5 Conference with the parties on March 1, 2018. *See* Min. Entry, docketed Mar. 1, 2018. During the conference, Respondent "stated that follow up visits [that occurred prior to six months post vaccination] alone [did] not indicate that [Petitioner] continue[d] to have symptoms" and therefore his "position [was] that the [six-month] requirement [was] not met . . . ." ECF No. 34 at 1. Petitioner noted that she "ha[d] described her symptoms as ongoing in her affidavits[]" and she had "not [yet] had the opportunity to speak with [her] treating physicians to corroborate [her] statements." *Id.* I told the parties that obtaining clarification from Petitioner's treater would be beneficial and ordered them to draft mutually-agreeable questions to send to Petitioner's treater by April 2, 2018. *Id.*

On April 2, 2018, the parties filed a joint status report requesting additional time to send mutually-agreed upon questions to Petitioner's treater. ECF No. 35 at 1. I ordered the parties to file a status report on the progress of obtaining clarification of the medical records by May 3, 2018. Non-PDF Order, docketed Apr. 3, 2018. On April 12, 2018, Diana Stadelnikas substituted in as Petitioner's counsel, *see* Clerks' Not., docketed Apr. 12, 2018, and the parties filed a joint status report on May 3, 2018, indicating that Petitioner anticipated filing additional evidence regarding the six-month requirement by June 4, 2018, ECF No. 37.

On May 21, 2018, Petitioner filed an affidavit outlining lifestyle changes she claimed were caused by her alleged vaccine-induced optic neuritis. Pet'r's Ex. 18, ECF No. 38-2. On June 4, 2018, the parties filed a joint status report indicating that Petitioner's treater "ha[d] stated that she [would] not provide any information beyond the information already contained in the medical records." ECF No. 39. I held a status conference with the parties on June 18, 2018, *see* Min. Entry, docketed June 18, 2018, and told Petitioner that "because [her treater] refused to clarify the medical records," I would "defer to the plain language to interpret the medical records[]" if any ambiguity existed, ECF No. 40 at 1. Petitioner requested an opportunity to submit an expert report to clarify whether the six-month requirement was met, and I ordered her to submit such a report by August 17, 2018. *Id.*

Over the next five months, Petitioner filed four motions for extensions of time to submit an expert report, ECF Nos. 41–44, which I granted, Non-PDF Orders, docketed Aug. 20, 2018; Sept. 18, 2018; Oct. 19, 2018; Nov. 19, 2018. Petitioner was ultimately unsuccessful in securing an expert opinion and therefore filed a motion for a decision dismissing her petition on December 17, 2018. ECF No. 46. I issued a decision dismissing her petition on December 21, 2018. ECF No. 47.

Petitioner filed her motion for attorneys' fees and costs on March 26, 2019.  Pet'r's Mot. for AFC.  Respondent filed his Response on April 8, 2019, objecting to an attorneys' fees and costs award on the grounds that Petitioner had not established a reasonable basis to bring her claim.  Resp't's Resp.  Petitioner filed her reply on April 15, 2019.  Pet'r's Reply.

This matter is now ripe for consideration.

### II.     Factual Background

Petitioner received the Tdap vaccination at issue in this case on September 6, 2016.  Pet'r's Ex. 2 at 1.  On October 24, 2016, Petitioner presented to optometrist Stephen Merckle, O.D., complaining of pressure and visual disturbances in her right eye for the past three weeks.  Pet'r's Ex. 11 at 5.  In light of Petitioner's symptoms, Dr. Merckle referred Petitioner for a neuro-ophthalmology consultation.  *Id.* at 10.

On October 26, 2018, Petitioner presented to neuro-ophthalmologist Sydnee Givre, M.D., Ph.D.  Pet'r's Ex. 4 at 18.  Petitioner reported "develop[ing] pain in the outer corner of [her] right eye and right[-]sided headache about three weeks ago."  *Id.*  Petitioner also noted that two weeks prior, she "noticed pain with eye movement" and currently was experiencing "splotchy" vision.  *Id.*  Dr. Givre's impression was that Petitioner's "exam and history [were] most [consistent with] retrobulbar neuritis[,]" and she "discussed optic neuritis with [Petitioner] in detail . . . ."  *Id.*  Dr. Givre also discussed "the importance of [a] brain MRI in determining the risk for [developing multiple sclerosis]" and ordered a brain "MRI to check retrobulbar optic nerve and . . . for demyelination . . . ."  *Id.*

Petitioner underwent a brain MRI on October 30, 2016.  *Id.* at 16.  The results showed "[p]rominent enhancement of the right intraorbital optic nerve in its anterior portion, consistent with active optic neuritis."  *Id.*  Dr. Givre therefore ordered a four-day course of intravenous solumedrol, which Petitioner began on November 15, 2016.  *Id.* at 14.  Petitioner returned to Dr. Givre on November 29, 2016, for a follow-up and reported that her vision had been "improving slowly since the [solumedrol] treatment."  *Id.* at 5.  Dr. Givre noted that "[visual field] testing [was] unreliable (as it was on the first visit) so it [was] difficult to make a[] judgement on whether the optic neuritis [was] improving other than based on [Petitioner's] perception that it [was]."  *Id.* at 7.  Petitioner planned to follow-up with Dr. Givre again in two weeks.  *Id.*

Petitioner presented to Dr. Givre for a follow-up on December 13, 2016 and complained of worsening vision.  Pet'r's Ex. 6 at 52.  Dr. Givre's impression was "relapse [of] right optic neuritis[,]" and she expressed "concern[ that] this [was] an atypical optic neuritis . . . ."  *Id.* at 54.  Dr. Givre ordered blood work and another four-day solumedrol treatment, which Petitioner began on December 14, 2016.  *Id.* at 54, 57.

Petitioner had another follow-up with Dr. Givre on January 4, 2017.  *Id.* at 15. Petitioner reported that her "vision [was] better but still a bit dark directly in the center," and she had no "eye

3

pain." *Id.* Dr. Givre ordered a chest CT to test for sarcoidosis[3] and planned to follow-up with Petitioner in three weeks. *Id.* at 17.

Petitioner underwent a chest CT on January 10, 2017, *id.* at 6, and returned to Dr. Givre for a follow-up on January 30, 2017, *id.* at 12. Dr. Givre noted that the chest CT "was abnormal but not [consistent with] sarcoid." *Id.* Petitioner reported that she "[thought her] vision [was] slightly better in the center[]" since her last visit and that she had not experienced any eye pain. *Id.* Dr. Givre's assessment was "optic neuritis . . . good recovery. Vision holding steady off steroids" and she planned to follow-up again in three months. *Id.* at 14.

Due to her abnormal chest CT, Petitioner presented to pulmonologist William Hall, M.D., on March 3, 2017. Pet'r's Ex. 7 at 3. Dr. Hall noted that Petitioner's chest CT "revealed [three] non-calcified nodules," which were "inconclusive." *Id.* Dr. Hall "offered a bronchoscopy to [definitively] diagnose sarcoidosis[,]" but Petitioner "declin[ed] further workup at [that] time" because "her vision [was] now cured with prednisone and she ha[d] no interest in pursuing any diagnostic testing unless absolutely necessary." *Id.* at 4. Dr. Hall noted that Petitioner's second solumedrol treatment after her optic neuritis relapse in December 2016 resulted in "full resolution of [her] symptoms." *Id.* Dr. Hall also wrote that Petitioner's optic neuritis was "[s]table and asymptomatic." *Id.* He told Petitioner to follow-up with him again in one year. *Id.*

On May 1, 2017, Petitioner presented to Dr. Givre for a follow-up. Pet'r's Ex. 7 at 13. Petitioner reported that her vision was "stable.," *id.*, and Dr. Givre noted that Petitioner had a "good recovery after [the] second round [of] solumedrol and [was] no[w] holding steady." *Id.* at 15. Dr. Givre told Petitioner to follow-up with her primary care physician but to "let [Dr. Givre] know immediately if there [were] any symptoms of reoccurrence." *Id.*

On August 29, 2017, Petitioner presented to Dr. Merckle complaining of "blurred" vision. Pet'r's Ex. 13 at 5, ECF No. 21-2. Dr. Merckle's examination of Petitioner's right eye revealed a "dark" spot on Petitioner's periphery. *Id.* at 9. Dr. Merckle did not prescribe any treatment for Petitioner at this visit but diagnosed Petitioner with presbyopia[4] and astigmatism.[5] *Id.* at 10. Dr. Merckle did not associate or note whether these new findings relate to Petitioner's optic neuritis. *See id.*

### III. Applicable Legal Standards

### A. Good Faith

---

[3] Sarcoidosis is defined as "a chronic, progressive, systemic granulomatous reticulosis of unknown etiology, characterized by hard tubercles. It can effect almost any organ or tissue, including the . . . eyes . . . ." *Dorland's Illustrated Medical Dictionary* 1668 (32nd ed. 2012) [hereinafter "*Dorland's*"].
[4] Presbyopia is defined as "hyperopia and impairment of vision due to advancing years or old age . . . ." *Dorland's* at 1511.
[5] Astigmatism is defined as "an error of refraction caused by unequal curvature of the refractive surfaces of the eye, so that a point source of light cannot be brought to a point focus on the retina but is spread over a more or less diffuse area." *Dorland's* at 168.

Under the Vaccine Act, a special master may award fees and costs for an unsuccessful petition if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e)(1); *see also Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). "Good faith" is a subjective standard. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). Petitioners act in "good faith" if they hold an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Petitioners are "entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996) (noting that in the absence of evidence of bad faith, the special master was justified in presuming the existence of good faith). Respondent does not contest that this petition was filed in good faith, *see* Resp't's Resp. at 4 n.1, and I find that the good faith standard is met in this case.

### B. Reasonable Basis

Respondent does, however, contest the reasonable basis for this petition. *Id.* at 6. "Reasonable basis" is not explicitly defined in the Vaccine Act or Rules. Generally, "the Vaccine Act requires that petitions be accompanied with evidence of injury . . . [to] ensure[] that petitioners and their counsel make some effort to establish that there was a vaccination and an injury that may be linked to the vaccine." *Simmons v. Sec'y of Health and Human Servs.*, 128 Fed. Cl. 579, 583 (2016), *aff'd*, 875 F.3d 632 (Fed. Cir. 2017) (internal citations omitted). Deciding whether a claim has a reasonable basis "is within the discretion of the Special Master . . . ." *Id.* at 582 (internal citations omitted).

In determining reasonable basis, a court looks not at the likelihood of the claim's success, but instead assesses its feasibility based on objective evidence. *Turner*, 2007 WL 4410030, at *6 (citing *Di Roma v. Sec'y of Health and human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)). Thus, petitioners must offer more than an unsupported assertion that a vaccine caused the injury alleged. *See, e.g.*, *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1377 (Fed. Cir. 1994); *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 303–04 (2011); *Cortez v. Sec'y of Health & Human Servs.*, No. 09-176V, 2014 WL 1604002, at *5 (Fed. Cl. Spec. Mstr. Mar. 26, 2014). Petitioners must "affirmatively demonstrate [the] reasonable basis" of their claim through some objective evidentiary showing. *McKellar*, 101 Fed. Cl. at 305. Such a showing "must, at a minimum, be supported by medical records or medical opinion." *Everett v. Sec'y of Health and Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Fed. Cl. Spec. Mstr. Feb 7, 1992). In addition, "because Vaccine Act claims may involve state-of-the-art scientific developments, untested theories, and unknown interactions and results, these difficult cases may entail close calls . . . [and] the standard for assessing . . . reasonable basis . . . should reflect this reality." *Cottingham v. Sec'y of Health and Human Servs.*, 134 Fed. Cl. 567, 574 (2017).

### IV. Arguments

### A. Respondent

Respondent's argument that Petitioner lacked a reasonable basis to bring her claim centers on her failure to meet the Vaccine Act's "six-month" requirement. *See* Resp't's Resp. at 5. This requirement mandates that a petition contain allegations that the injured person "suffered the residual effects or complications of [the alleged] illness, disability, injury, or condition for more than [six] months after the administration of the vaccine." §300aa-11(c)(1)(D)(i). Respondent argues that, despite Petitioner's claims in her petition and affidavits that she suffered residual effects of her optic neuritis for six-months post vaccination and still continues to suffer from them, "[P]etitioner's medical records d[o] not support these allegations." Resp't's Resp. at 5. To support his argument, Respondent cites to Petitioner's medical records beginning on March 6, 2017, which Respondent correctly notes is "six months after the Tdap vaccination" at issue. *Id.* Respondent argues that the records reflect that, as of six-months post vaccination, Petitioner's optic neuritis was "cured" and that she had made a "complete recovery." *Id.* Because of this, Respondent concludes that "[P]etitioner has failed to establish a reasonable basis for the claim set forth in the petition . . . ." *Id.* at 6.

### B. Petitioner

In response, Petitioner argues that her medical records "document ongoing sequelae, reasonably attributable to optic neuritis in the context of meeting the six-month [requirement] . . . ." Pet'r's Resp. at 9. To support this assertion, Petitioner relies on two office visits noted in her medical records. The first is with Dr. Givre on May 1, 2017. Pet'r's Ex. 7 at 13. At this visit, Dr. Givre assessed Petitioner's vision as "holding steady," and directed her to follow up "immediately if there [was] any symptom reoccurrence." *Id.* at 15. An examination of Petitioner's right eye conducted at this visit revealed "trace temporal pallor[6]." *Id.* at 14. The second visit is with Dr. Merckle on August 29, 2017. Pet'r's Ex. 13 at 5. At this visit, Petitioner complained of "blurred" vision, and an exam showed a dark spot on the periphery of Petitioner's right eye. *Id.* at 5, 9. Petitioner argues that these visits "provide[] a reasonable basis to proceed until such time [that] a qualified expert could review [the case] and opine regarding symptomology and causation." Pet'r's Resp. at 9. Petitioner notes that her medical records contained ambiguities regarding her symptoms during this time, and she attempted to obtain clarification from her treater to resolve these ambiguities. *Id.* Because her treater refused to provide any context and she was unable to obtain an expert report, she promptly filed a motion to dismiss her petition. *Id.*

### V. Analysis

Petitioner's evidence demonstrates that she possessed a reasonable basis to bring this claim. The evidence shows that Petitioner received a covered vaccine, developed a cognizable and diagnosed injury, and suffered documented residual effects of that injury for a minimum of four months. Petitioner's medical records contained ambiguities regarding her symptoms after that time, but they described ongoing injury and abnormalities during optical exams. Meanwhile, she maintained in her petition and affidavits that she continued to experience residual symptoms past

---

[6] Pallor is defined as "paleness." *Dorland's* at 1365. This finding could be indicative of optic atrophy. Vivian B. Osaguona, *Differential Diagnoses of the Pale/White/Atrphic Disk*, 29(96) COMMUNITY EYE HEALTH 71 (2016), retrieved from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5365044/. Optic atrophy is "atrophy of the optic disk resulting from the degeneration of the nerve fibers of the optic nerve and optic tract." *Dorland's* at 176.

6

six-months post vaccination. The parties drafted mutually-agreeable questions for Petitioner's treater in an attempt to clarify the medical record. The fact that Petitioner's treater declined to provide context to the medical records does not mean that Petitioner's claim lacked reasonable basis.

Respondent attempts to hold Petitioner to a reasonable basis standard centered around the likeliness of success rather than on feasibility. Petitioner's medical records, while demonstrating vaccination, injury, and treatment, were nonetheless complex and ambiguous. As the Court has stated, "difficult cases may entail close calls . . . [, and] the standard for assessing . . . reasonable basis . . . should reflect this reality." *Cottingham*, 134 Fed. Cl. at 574. Petitioner correctly noted in her reply brief that the issue of whether she met the six-month sequelae requirement was a close call. Indeed, there was objective, albeit ambiguous, evidence in her medical records that she suffered the residual effects of her injury for at least six-months post vaccination. Dr. Merckle, for example, made the objective finding that Petitioner's right eye had "trace temporal pallor," which may have been an indication of optic atrophy. Pet'r's Ex. 7 at 14; *see also supra* note 6. I will not punish Petitioner for ultimately being unable to obtain clarification from her treater or an expert opinion supporting causation. Therefore, I find that Petitioner had a reasonable basis to file her petition.

## VI. Reasonable Attorneys' Fees and Costs

### A. Reasonable Rates

Forum rates are used in the lodestar formula, except when the rates in an attorney's local area are significantly lower than forum rates. *Avera v. Sec'y of Health and human Servs.*, 515 F.3d 1343, 1348–49 (Fed. Cir. 2008). In a 2015 decision, Special Master Gowen determined the reasonable forum rate ranges for attorneys with varying years of experience. *See McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323, at *18–19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *mot. for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). When considering whether a requested rate is reasonable, special masters may consider an attorney's overall legal experience and his experience in the Vaccine Program, as well as the quality of the work performed. *Id.* at *17. The *McCulloch* rates have been updated for subsequent years and are accessible on the Court's website at http://www.uscfc.uscourts.gov/vaccine-programoffice-special-masters.

#### i. Requested Rates

Petitioner requests the following hourly rates for the attorneys and paralegals who worked on this matter:

- Altom Maglio:
    - 2017: $362.00
    - 2018: $381.00
- Amber Wilson:
    - 2017: $290.00
- Anne Toale:

7

- - - 
            - 2017: $378.00
            - 2018: $402.00
    - Diane Stadelnikas:
        - 2016: $359.00
        - 2017: $372.00
        - 2018: $396.00
        - 2019: $415.00
    - Paralegals:
        - 2016: $105.00-$135.00
        - 2017: $145.00
        - 2018: $148.00
        - 2019: $154.00

Pet'r's Ex. 19 at 16, ECF No. 51-1.

These attorneys and paralegals practice in Sarasota, Florida and Washington, DC. Therefore, forum rates apply. I find that these rates are reasonable and in accordance with *McCulloch* and align with what other Special Masters have awarded in the past. *McCulloch*, 2015 WL 5634323, at *18–19; *see also Reed v. Sec'y of Health and Human Servs.*, No. 08-650V, 2019 WL 2500417, *3 (Fed. Cl. Spec. Mstr. May 21, 2019); *Crespo v. Sec'y of Health and Human Servs.*, No. 15-1100V, 2018 WL 3991263, *2 (Fed. Cl. Spec. Mstr. July 5, 2018); *Anderson v. Sec'y of Health and Human Servs.*, No. 17-1452, 2019 WL 4255997, *2 (Fed. Cl. Spec. Mstr. Aug. 12, 2019).

### ii. Hours Expended

The second step in *Avera* is for the Court to make an upward or downward modification based upon specific findings. *Avera*, 515 F.3d at 1348. Although the undersigned finds that the hourly rates are reasonable, the undersigned has determined that a reduction in the number of hours requested is appropriate. Four attorneys and seven paralegals billed hours in this case. As other special masters have noted, this type of staffing model leads to inefficiency and unnecessary billing entries. *See Reed*, 2019 WL 2500417, at *4; *Rice v. Sec'y of Health & Human Servs.*, No. 15-1335, 2018 WL 4784563 (Fed. Cl. Spec. Mstr. Aug. 27, 2018). Therefore, I will reduce Petitioner's requested attorneys' fees by 5%. After this reduction, Petitioner is entitled to **$18,974.35** in attorneys' fees.

### B. Reasonable Costs

Similar to attorneys' fees, a request for reimbursement of costs must be reasonable. *Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992). Petitioner has requested $2,596.86 in costs, the majority of which was spent obtaining an expert opinion from Joseph F. Rizzo, M.D. Dr. Rizzo billed at a rate of $650 an hour for his review of this case. Petitioner did not submit documentation justifying Dr. Rizzo's rate nor his credentials. However, Dr. Rizzo's rate has been awarded in the Program previously, and Special Master Roth provided a detailed review of his credentials and sound reasoning for his rate. *See Nwala v. Sec'y of Health and Human Servs.*, No. 16-923V, 2019 WL 2005751, *3–4 (Fed. Cl. Spec. Mstr. Apr. 12, 2019). I will

8

therefore award Dr. Rizzo a rate of $650 for his work on this case for a total of $1,625 in expert costs.

Petitioner's remaining requested costs are comprised of fees for obtaining medical records and travel. I find these costs reasonable and award them in full. Therefore, I award Petitioner costs in the amount of **$2,596.86**.

## VII.  Conclusion

In accordance with the Vaccine Act, I award Ms. Stadelnikas $18,974.35 in attorneys' fees and $2,596.86 in costs. Accordingly, I award the total of **$21,571.21** to be issued in the form of a check payable jointly to Petitioner and Petitioner's counsel, Ms. Diana L. Stadelnikas, of Maglio Christopher and Toale, PA, for attorneys' fees and costs.[7]

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.